[No. A121137. First Dist., Div. Four. Mar. 17, 2009.]

AMERICAN CIVIL RIGHTS FOUNDATION, Plaintiff and Appellant, v.
BERKELEY UNIFIED SCHOOL DISTRICT et al., Defendants and
Respondents;
JUDY APPEL et al., Interveners and Respondents.

**COUNSEL**

Pacific Legal Foundation, Alan W. Foutz and Paul J. Beard II for Plaintiff and Appellant.

Keker & Van Nest, Jon B. Streeter and Benjamin B. Au for Defendants and Respondents.

Miriam Rokeach for Former Directors of the Board of Education for the Berkeley Unified School District as Amicus Curiae on behalf of Defendants and Respondents.

Brenda E. Sutton-Wills and Alice O'Brien for California Teachers Association as Amicus Curiae on behalf of Defendants and Respondents.

American Civil Liberties Union Foundation of Northern California, Jory C. Steele, Greta S. Hansen, Alan L. Schlosser; Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Kendra Fox-Davis, Charles Forster, Robert Rubin; ACLU Foundation of Southern California and Catherine E. Lhamon for Interveners and Respondents.

OPINION

**SEPULVEDA, J.**—Racial integration of America's public schools began with *Brown v. Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686], when the United States Supreme Court ruled that state-imposed segregation in education that intentionally discriminated against African-Americans on the basis of their race was unconstitutional. Half a century after *Brown*, some educators have gone beyond removing state-imposed segregation, and have implemented affirmative policies fostering social diversity in their schools. The question confronting courts today is whether these new policies go too far and themselves improperly discriminate on the basis of race.

We conclude that the particular policy challenged here—which aims to achieve social diversity by using neighborhood demographics when assigning students to schools—is not discriminatory. The challenged policy does not use racial classifications; in fact, it does not consider an individual student's race at all when assigning the student to a school. Instead, the assignment policy looks at the student's residential neighborhood, and considers the average household income in the neighborhood, the average education level of adults residing in the neighborhood, and the racial composition of the neighborhood as a whole. Every student within a given neighborhood receives the same treatment, regardless of his or her individual race. We find that educators who include a general recognition of the demographics of neighborhoods in student assignments, without classifying a student by his or her race, do not "discriminate against, or grant preferential treatment to, any individual or group on the basis of race." (Cal. Const., art. I, § 31, subd. (a).)

## I.   FACTS[1]

In 1996, California voters adopted Proposition 209, which amended the state Constitution to provide that state and local government entities (including school districts) "shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." (Cal. Const., art. I, § 31, subds. (a), (f) (section 31).)

Plaintiff American Civil Rights Foundation (ACRF) is a nonprofit corporation "dedicated to monitoring and enforcing the civil rights laws," with at

---

[1] This appeal is from a defense judgment following an order sustaining a demurrer to plaintiff's complaint. On such an appeal, we look only to the pleadings and matters that may be judicially noticed. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) We assume the truth of all material facts properly pleaded in the complaint. (*Ibid.*)

least one member living in Berkeley, California. In October 2006, ACRF sued the Berkeley Unified School District, its superintendent, and the Berkeley Board of Education (collectively School District) for alleged constitutional violations in assigning students among the School District's 11 elementary schools, and in assigning students to academic programs within the School District's only high school.[2] ACRF alleged that the School District used race to discriminate against, and to grant preferences to, students when making student assignments, in violation of section 31.[3]

## A. *The Elementary Student Assignment Plan*

The School District has a long history of trying to eliminate school segregation "created by the de-facto residential segregation within the City" of Berkeley. From September 2000 forward, "[a]s a result of the changing legislation in California," the School District explored assertedly "race neutral factors to create school diversity." In 2004, the School District adopted the "Elementary Student Assignment Plan" (Plan) at issue here. The Plan determines which of the School District's 11 elementary schools (kindergarten through fifth grade) a child will attend.

The avowed purpose of the plan is to "promote the values of socioeconomic and racial diversity," and is founded upon a belief "that diversity in our student population enriches the education experiences of students; advances educational and occupational aspirations; enhances critical thinking skills; facilitates the equitable distribution of resources; reduces, prevents or eliminates the effects of racial and social isolation; encourages positive relationships across racial and economic lines by breaking the cycle of racial hostility to foster a community of tolerance and appreciation of students from varied and diverse backgrounds; and promotes participation in a pluralistic society." When supporting adoption of the plan, the School District superintendent stated that a multifactor approach would enrich the educational experience of all students by expanding diversity beyond racial and ethnic considerations to include socioeconomic factors.

Student assignments under the Plan proceed through several layers: parental choice; priority categories; and diversity categories (the last of which is at issue on appeal). Parents complete a parent preference form in which parents rank (in order of preference) three of the 11 elementary schools they wish their child to attend. The School District attempts to assign students based on their parents' preferences but assignment is made within the constraints of six priority categories. The priority rankings are: (1) students currently attending

---

[2] ACRF also sued the School District over its admission policy to a tutoring program. The parties stipulated to dismissal of that cause of action and it is not an issue in this appeal.

[3] We use the term "race" to include ethnicity, color, and national origin.

the school who live within that school's geographic "attendance zone";[4] (2) students currently attending the school who live outside the zone; (3) siblings of students currently attending the school; (4) School District residents not attending the school who live within the zone; (5) School District residents not attending the school who live outside the zone; and (6) nonresidents wanting an interdistrict transfer.

Within a given priority category, the School District uses diversity categories to make assignments with the goal that the student body at each elementary school reflects the racial and socioeconomic diversity of the total elementary school population in the attendance zone.[5] The School District calculates a student's diversity category by dividing the district into 445 "planning areas," which are geographic divisions typically between four and eight city blocks. Each planning area receives a diversity category of one, two, or three that measures that area's composite diversity, which is based on three factors: (1) the average household income of those living in the planning area; (2) the average education level attained by adults living in the planning area; and (3) the percentage of "students of color" living in the planning area.[6] Information on household income and education level is obtained from census data, and the percentage of students of color is derived from a multiyear pool of student data collected by the School District. Planning areas containing a relatively high concentration of students of color from low-income, lower educated households are generally category one planning areas. Planning areas containing a relatively high concentration of White students from high-income, higher educated households are generally category three planning areas. Planning areas whose demographics are less concentrated in terms of race, household income, and education level are generally category two planning areas. Every student within a given planning area receives the same diversity score, regardless of his or her individual race. The Plan states: "[T]he actual personal attributes of students" is not relied upon "in determining student assignments." Instead, "diversity characteristics derived from the planning area in which the student lives" are used

---

[4] The 11 elementary schools are divided among three geographic attendance zones, which are drawn with the goal that each zone reflect the racial or ethnic diversity of the School District as a whole. The School District's establishment of attendance zones based on communitywide demographics is not challenged here.

[5] The School District asserts in its briefing on appeal that only those students in priority categories four through six are subject to assignment based on diversity categories, while students in the higher priority categories (current students and their siblings) are automatically admitted into the current school. The record at this early stage of the proceedings is unclear on that point, so we will accept the complaint's allegation that students in all priority categories are subject to diversity considerations.

[6] The Plan sometimes refers to "parent" income and education level as diversity factors but the details of the Plan indicate that income and education levels of all adult residents from the planning area are calculated, not just those residents who are parents of School District students.

to calculate a diversity category, and students from each category are assigned proportionately to individual schools to approximate the racial and socioeconomic diversity of the geographic attendance zone as a whole.

As an example of how the Plan operates, we use the scenario proposed by plaintiff ACRF in its briefing on appeal. Assume an elementary school has a concentration of fourth graders living in category one planning areas that is substantially higher than the concentration of category one students within the entire district. That school then receives applications to enroll from two fourth graders who have just moved into the school's attendance zone. One of the students lives in a category one planning area and the other student lives in a category three planning area. The School District will give the student living in a category three planning area a higher priority for enrollment over the student living in a category one planning area. That student will receive priority regardless of whether his or her own personal attributes (household income and education levels, and race) match the general attributes of the planning area in which the student lives.

B. *The High School Student Assignment Plan*

The School District has one high school comprising grades 9 to 12: Berkeley High School. Students have the option of choosing from six academic programs with differing curricula. The academic programs include four "small schools": the Arts and Humanities Academy; Community Partnership Academy; Communication Arts and Sciences; and School of Social Justice and the Environment. The programs also include two "smaller learning communities within the Comprehensive High School": Academic Choice and Berkeley International High School. The system used to assign students to the various programs at Berkeley High School is modeled on the elementary school assignment plan and its diversity categories.

All students rank their preferences for each of the six programs and are assigned a diversity category based on the same factors used to determine an elementary school child's diversity category: (1) the average household income of those living in the student's residential planning area; (2) the average education level attained by adults living in the planning area; and (3) the percentage of students of color living in the planning area. The School District determines the number of students that may enroll in each academic program based on a proportional representation of students within diversity categories that match (within a set range) the diversity of Berkeley High

School as a whole. A computer then randomly selects students and assigns them to their highest ranked program choice where openings are still available.[7]

For example, the approximate number of all Berkeley High School students in category three is 22 percent. Assuming a grade level within a particular academic program has a total enrollment capacity of 100 students, the program would aim to enroll 22 students from category three. Once that target number is reached, the program is no longer open to students from diversity category three wishing to enroll, but may remain open to students from other diversity categories.

Like the elementary student assignment plan, assignments to Berkeley High School academic programs do not consider the race of the individual student. Every student in a particular neighborhood, or planning area, receives the same diversity rating regardless of the student's race.

## II. PROCEDURAL HISTORY

Plaintiff ACRF filed its complaint for declaratory and injunctive relief on October 14, 2006, challenging the constitutionality of the School District's student assignment policies. (§ 31.) The School District demurred to the complaint on January 5, 2007. On that same date, six parents of School District children sought to intervene in the action to join with the School District in defending the student assignment policies.[8] The trial court granted the motion to intervene, and the interveners joined in the School District's demurrer.

ACRF filed its opposition to the demurrer on January 17, 2007, and the School District served its reply on January 24, 2007. The demurrer was heard on January 31, 2007, and on April 6, 2007, the trial court sustained the demurrer without leave to amend as to the causes of action relevant to this appeal. The demurrer was overruled as to a separate cause of action concerning a challenge to the School District's admission policy to a tutoring program. As noted earlier, the parties stipulated to dismissal of that cause of action and it is not an issue in this appeal. The order of dismissal on that distinct cause of action was filed on January 29, 2008. Judgment for defendants was filed on February 5, 2008.

---

[7] Preference is given to siblings of students returning to a particular program, and special education students and English language learners are placed in distinct categories, and may be directly assigned to the classes that best serve them.

[8] Interveners are Judy Appel, Alison Bernstein, Maria Echaveste, Roia Ferrazares, Isabelle Mussard, and Mai Linh Spencer.

Plaintiff ACRF filed a notice of appeal on March 19, 2008. Plaintiff and defendants (School District and intervener parents) filed briefs on appeal. Amicus curiae briefs in support of defendants were also filed by the California Teachers Association and former directors of the board of education for the School District.

## III. DISCUSSION

Does a school board's use of neighborhood demographic data in assigning students to schools or academic programs violate section 31 of the California Constitution when the data includes information about the racial composition of neighborhoods? In answering that question, we must be conscious of several matters.

### A. *Principles requiring judicial restraint*

■ First, the Legislature has granted school boards wide authority to set policies for the communities they serve. (Ed. Code, § 35160.) The Legislature has declared that school boards and districts "have diverse needs unique to their individual communities and programs," and "in addressing their needs, common as well as unique, school districts . . . should have the flexibility to create their own unique solutions." (Ed. Code, § 35160.1, subd. (a).) The authority of school boards extends to setting student assignment policies. Decades ago, it was observed that California public school boards have "pervasive control over and continuing responsibility for both the daily decisions and the long range plans which . . . determine the racial and ethnic attendance pattern of its district's schools," including "plenary authority to determine school assignment policies" and "to establish and reestablish geographic attendance zones." (*Crawford v. Board of Education* (1976) 17 Cal.3d 280, 294 [130 Cal.Rptr. 724, 551 P.2d 28].) A school board also has authority to adopt a school integration plan. (Cal. Const., art. I, § 7, subd. (a).) Of course, a school board's authority is not unlimited: a school board may not initiate policies or programs in conflict with the law. (Ed. Code, § 35160.) But our role as judges is also limited: we determine the legality of the school board's policy, not its wisdom.

■ Second, ACRF is claiming that the School District's student assignment policy is unconstitutional on its face, not as applied in a particular case, and thus must meet a heavy burden of proof. "A facial challenge is ' "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [law] would be valid." ' [Citation.] The moving party must show that the challenged statutes or regulations ' " 'inevitably pose a present total and fatal conflict' " ' with applicable prohibitions." (*T.H. v. San Diego Unified School Dist.* (2004) 122

Cal.App.4th 1267, 1281 [19 Cal.Rptr.3d 532], italics omitted.) Our task, therefore, is to determine whether the challenged policy can constitutionally be applied in any set of circumstances. (*Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 267 [5 Cal.Rptr.2d 545, 825 P.2d 438].)

■ Third, our aim when interpreting a constitutional amendment adopted by voter initiative is to determine and effectuate the voters' intent. (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 444 [79 Cal.Rptr.3d 312, 187 P.3d 37].) "If the language is clear and unambiguous, the plain meaning governs." (*Ibid.*) " 'When the language is ambiguous, "we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." [Citation.]' [Citation.] However, a court cannot insert or omit words to cause the meaning of a statute to conform to a presumed intent that is not expressed. [Citations.] 'As a judicial body, it is our role to interpret the laws as they are written.' [Citation.] '[W]e may not properly interpret the measure in a way that the electorate did not contemplate: the voters should get what they enacted, not more and not less.' " (*Citizens to Save California v. California Fair Political Practices Com.* (2006) 145 Cal.App.4th 736, 747–748 [52 Cal.Rptr.3d 17].)

## B. *Section 31's plain meaning*

With these principles in mind, we turn to plaintiff ACRF's contention that section 31 prohibits the School District from using a student's residential neighborhood demographics—which include consideration of the neighborhood's racial composition—to assign students to schools and academic programs. Section 31 provides, in relevant part: "The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."

■ Interpreting the provision in accordance with the natural and ordinary meaning of its words, our Supreme Court has held that " '[D]iscriminate' " means " 'to make distinctions in treatment; show partiality (in favor of) or prejudice (against).' " (*Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 559 [101 Cal.Rptr.2d 653, 12 P.3d 1068], italics omitted (*Hi-Voltage Wire Works*).) The word " 'preferential' " means "giving 'preference,' which is 'a giving of priority or advantage to one person . . . over others.' " (*Id.* at p. 560.)

■ We conclude that the challenged student assignment policy does not violate section 31 because the policy does not show partiality, prejudice, or

preference to any student on the basis of that student's race. All students in a given residential area are treated equally—regardless of the student's individual race or other personal characteristics. The challenged policy is explicit on this point: "[T]he actual personal attributes of students" are not relied upon "in determining student assignments." To the extent that any preference is given to a student, it is on the basis of several factors relating to the collective composition of the student's neighborhood (household income, education level, and race), not the student's race.

Plaintiff ACRF argues that section 31 prohibits the School District from "using race" in any fashion, even when classifying neighborhoods and not individuals. The argument is contrary to the plain language of section 31, which provides that the state "*shall not discriminate against, or grant preferential treatment to*, any individual or group on the basis of race." (Italics added.) Section 31 does not say that the state shall not consider race for any and all purposes. The constitutional provision prohibits unequal treatment of particular persons and groups of persons; it does not prohibit the collection and consideration of communitywide demographic factors.

ACRF, in an attempt to fit its argument within the text of section 31, notes that the provision prohibits discrimination against " 'any individual or group.' " ACRF maintains that the School District runs afoul of section 31 by using the race of a group (a student's neighborhood) to discriminate. ACRF's argument is that section 31 prohibits using the race "of either an individual or a group in order to give preferences or discriminate." The argument distorts the language of the constitutional provision by omitting the subject of the sentence: section 31 prohibits using the race of an individual or group in order to give preference to, or to discriminate against, *that individual or group*. Here, the School District does not use the race of a student or student group to give preference to that student or student group. Instead, the School District reviews the racial composition of a neighborhood (which includes multiple races) to assess the neighborhood's level of social diversity and, based on that diversity rating, assigns students to various schools and programs. While the race of an individual student may be included within this composite diversity rating (along with the race of all students in the neighborhood), any preference given to the student is not based on the student's race. White and African-American students from the same neighborhood receive the same diversity rating and the same treatment.

ACRF next argues that the School District uses the diversity rating as a veiled substitute for a student's race that does not show the precise race of a student but shows the "likely" race of a student. ACRF claims that a student from a neighborhood planning area with a diversity category of one is more likely to be a student of color than a student coming from a category three

planning area. The claim is unsupported by the record on appeal. The elementary school student assignment plan, incorporated into the complaint, shows that a diversity category rating is derived by averaging three demographic factors, of which race is one. There is no indication that, in every case, a student from a category one planning area is more likely to be a student of color than is a student from a category three planning area. It appears mathematically possible that a category one planning area may have more White students than students of color depending on the area's household income and adult education levels.

■   While it is conceivable, as the School District concedes, that some neighborhoods are so racially segregated that using demographic data could potentially serve as a proxy for a student's race, that hypothetical possibility cannot sustain ACRF's facial challenge to the constitutional validity of the district's student assignment policy. On a facial challenge, we do not consider the policy's application to the particular circumstances of an individual. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) "[O]ur task is to determine whether the [challenged policy] can constitutionally be applied." (*Arcadia Unified School Dist. v. State Dept. of Education, supra*, 2 Cal.4th at p. 267.) " 'To support a determination of facial unconstitutionality, voiding the statute [or policy] as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.' " (*Ibid.*, italics omitted.) ACRF has not shown that the policy provisions challenged here inevitably pose a total and fatal conflict with section 31.

C.   *Ballot materials as extrinsic aids to interpretation*

While the language of section 31 (adopted by the voters as Proposition 209 in 1996) is clear and dooms ACRF's argument that the state is precluded from any consideration of race, regardless of discriminatory impact on individuals or groups, we may test our construction of section 31 against those extrinsic aids that bear on the voters' intent, particularly the ballot pamphlet materials distributed to registered voters in advance of the 1996 election.[9] (*Hi-Voltage Wire Works, supra*, 24 Cal.4th 537, 559.) Those

---

[9] Defendants have requested that we also take judicial notice of ballot materials for Proposition 54, a failed initiative placed on the ballot in 2003 that proposed restricting governmental collection and use of race-related information. Defendants argue that these materials show that Proposition 209 did not itself restrict the collection and use of race-related information. We deny the request for judicial notice and focus our attention on the voters' intent in 1996, when they adopted Proposition 209.

materials are set out in an appendix to the *Hi-Voltage Wire Works* case, and demonstrate that not all race-conscious actions were meant to be eliminated—only those that discriminated against, or granted preferential treatment to, individuals or groups on the basis of that individual's or group's race. (*Id.* at pp. 599–602.)

As the Legislative Analyst presented the matter to the electorate, Proposition 209 was said to "eliminate state and local government affirmative action programs in the areas of public employment, public education, and public contracting *to the extent these programs involve 'preferential treatment' based on race*, sex, color, ethnicity, or national origin." (*Hi-Voltage Wire Works, supra,* 24 Cal.4th at p. 599, italics added.) The Legislative Analyst observed: "the measure could eliminate, or cause fundamental changes to, voluntary desegregation programs run by school districts. . . . Examples of desegregation spending that could be affected by the measure include the special funding given to (1) 'magnet' schools (*in those cases where race or ethnicity are preferential factors in the admission of students* to the schools) and (2) designated 'racially isolated minority schools' that are located in areas with high proportions of racial or ethnic minorities. . . . [¶] In addition, the measure would affect a variety of public school and community college programs such as counseling, tutoring, outreach, student financial aid, and financial aid to selected school districts *in those cases where the programs provide preferences to individuals* or schools based on race, sex, ethnicity, or national origin." (*Id.* at p. 600, italics omitted & added.)

The argument in favor of Proposition 209 stated, in part, that the measure "prohibits discrimination and preferences and allows any program that does not discriminate, or prefer, because of race or sex, to continue." (*Hi-Voltage Wire Works, supra,* 24 Cal.4th at p. 601.) The proponents of the measure argued: "Government should not discriminate. It must not give a job, a university admission, or a contract based on race or sex." (*Ibid.*) In rebuttal to an argument against Proposition 209 that the measure would eliminate a vast array of equal opportunity programs, the proponents argued: "Proposition 209 bans discrimination and preferential treatment—period. Affirmative action programs that don't discriminate or grant preferential treatment will be UNCHANGED." (*Id.* at p. 602.)

The ballot pamphlet materials reinforce our view that section 31 was not intended to preclude all consideration of race by government entities but rather was intended to prohibit only those state programs and policies that discriminate against or grant preferential treatment to any individual or group on the basis of race. (*Hi-Voltage Wire Works, supra,* 24 Cal.4th at pp. 599–602.)

D.  *Cases interpreting section 31*

Our interpretation and application of section 31 to uphold the School District's student assignment policy that considers the overall racial characteristics of neighborhoods, without classifying students by race, is also reinforced by a review of several cases that have previously construed the provision.

In *Hi-Voltage Wire Works*, the California Supreme Court held that a city's affirmative action program violated section 31 by granting preferential treatment in public contracting on the basis of race and gender. (*Hi-Voltage Wire Works, supra*, 24 Cal.4th at pp. 541–542.) The program required contractors bidding on city projects to utilize a specified percentage of racial minority and women subcontractors or to document efforts to include minority and women subcontractors in their bids. (*Id.* at p. 541.) The court concluded that the program discriminated against contractors on the basis of race and gender. (*Id.* at p. 562.) Importantly, the court emphasized that "section 31 categorically prohibits discrimination and preferential treatment," and did not hold that section 31 prohibits all consideration of race. (*Id.* at p. 567.)

In *Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 27–28 [112 Cal.Rptr.2d 5], the court struck down several affirmative action programs that gave preference in hiring and contracting based on race and gender classifications. However, the court upheld monitoring programs that collected and reported data concerning the participation of women and minorities in government programs. (*Id.* at pp. 46, 62–63.) The court noted that government has a compelling need for such information in order to address lingering discrimination and to develop appropriate legislative and administrative actions, such as "race-neutral and gender-neutral remedies." (*Id.* at pp. 46, 63.) Government programs that collect racial data do not implicate section 31 "[s]o long as such a program does not discriminate against or grant a preference to an individual or group." (*Id.* at pp. 46–47.)

In *Crawford v. Huntington Beach Union High School Dist.* (2002) 98 Cal.App.4th 1275, 1278, 1283–1285 [121 Cal.Rptr.2d 96], the court held that a school district's student transfer policy violated section 31 by conditioning transfers on a student's race. In an effort to maintain racial balance, the school district had a "one-for-one same race exchange policy" for a high school with a low percentage of White students. (*Id.* at p. 1278.) The policy was explained as follows: "[t]o prevent an 'inappropriate' racial and ethnic balance, the District restricts transfers to and from Westminster High School. If you are White and you live inside the high school's attendance area, you cannot transfer out unless another White student is willing to transfer in and take your place. If you are non-White and you live outside the high school's

attendance area, you cannot transfer in unless another non-White student is willing to transfer out and you take that student's place." (*Ibid.*) The policy was held discriminatory: "the policy creates different transfer criteria for students solely on the basis of their race." (*Id.* at p. 1284.) A White student wanting to transfer out could not do so unless another White student wanted to transfer in, but a non-White student wanting to transfer out was free of the one-for-one transfer restriction. (*Id.* at p. 1278, 1284.) And a non-White student (but not a White student) was precluded from transferring into the school without a one-for-one exchange.

While invalidating the discriminatory policy before it, the court was careful to note that "[i]t is not our intention to suggest that there cannot be any 'integration plans' under Proposition 209. We stress that an 'integration plan' developed by a school board need not offend Proposition 209 if it does not discriminate or grant preferences on the basis of race or ethnicity." (*Crawford v. Huntington Beach Union High School Dist., supra*, 98 Cal.App.4th at p. 1286.)

We see nothing in these cases to preclude educators from considering the overall racial characteristics of neighborhoods. The cases have interpreted section 31 to preclude the state and its subdivisions from classifying individuals by race and distributing benefits or burdens based on those racial classifications. The policy challenged here does not consider an individual student's race when assigning the student to a school, and thus presents a far different situation from those found unlawful.

■ In *Hi-Voltage Wire Works*, a city's public contracting program violated section 31 by classifying contractors by race and gender, and granting preferential treatment to racial minorities and women. (*Hi-Voltage Wire Works, supra*, 24 Cal.4th at p. 562.) The court in *Connerly v. State Personnel Bd., supra*, 92 Cal.App.4th at pages 16, 27–28, struck down similar programs that gave preference in hiring and contracting based on race and gender classifications. And the court in *Crawford v. Huntington Beach Union High School Dist., supra*, 98 Cal.App.4th at pages 1275, 1278, 1283–1285, held that a school district's student transfer policy violated section 31 by conditioning transfers on a student's race. While race-conscious decisionmaking that prefers individuals of one race over individuals of another race is unconstitutional, decision makers remain free to recognize that our society is composed of multiple races with different histories, to gather information concerning geographic distribution of the races, and to adopt race-neutral policies in an effort to achieve a fair allocation of resources. The desirability and exact contours of such programs in public education is a matter for parents and educators to decide.

## IV.   DISPOSITION

The judgment is affirmed.

Ruvolo, P. J., and Reardon, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 10, 2009, S172258. Werdegar, J., did not participate therein.