Filed 5/8/15

**CERTIFIED FOR PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>

CESAR BAEZ,

    Plaintiff and Appellant,

    v.

CALIFORNIA PUBLIC EMPLOYEES'
RETIREMENT SYSTEM et al.

    Defendants and Respondents.

</td><td>

B252772

(Los Angeles County
Super. Ct. No. BC498010)

</td></tr>
</table>

    APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael L. Stern, Judge.  Reversed and remanded.

    Meylan Davitt Jain Arevian & Kim, Robert L. Meylan, Vincent J. Davitt and Benedetto L. Balding; Schlam Stone & Dolan, Jeffrey M. Eilender and Elizabeth Wolstein, for Plaintiff and Appellant.

    K&L Gates, Christopher J. Kondon, Matthew B. O'Hanlon, and Saman M. Rejali, for Defendant and Respondent California Public Employees' Retirement System.

    Soltman, Levitt, Flaherty & Wattles, Kevin S. Wattles and Lisa R. Kamrath, for Defendant and Respondent Joseph Dear.

*    *    *

---

*    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of **DISCUSSION, parts II, III, and IV**.

This appeal presents the following question: Does a plaintiff who alleges he was treated differently because he is Latino state a claim for relief under the anti-affirmative action provision originally enacted as Proposition 209 and now codified in Article I, section 31 of the California Constitution? We conclude he does not, and agree with the trial court on this point. We nevertheless reverse the trial court's order dismissing this and other claims on demurrer because the plaintiff in this case has demonstrated a reasonable possibility of amending his complaint and, as we discuss in the unpublished portion of this opinion, because dismissal of plaintiff's remaining claims was improper.

## FACTS AND PROCEDURAL HISTORY

Plaintiff Cesar Baez (plaintiff) and two others signed two agreements forming (and dividing the profits earned by) two different companies—Centinela Investment Partners, LLC and Centinela Group, LLC. Of the three partners, two (including plaintiff) are Latino; the third is black. Defendant California Public Employees' Retirement System (CalPERS) is charged with managing the investments that fund the pensions of California state employees. CalPERS hired plaintiff and his partners to manage two $500 million investment funds. To effectuate this arrangement, plaintiff and his partners created two new entities that they (through the two Centinela entities named above) co-owned with CalPERS: (1) Centinela Holdings LLC, to serve as the two funds' manager; and (2) Centinela Capital Partners LLC, to serve as the two funds' investment advisor.

At some point thereafter, the California Attorney General began investigating whether CalPERS was unlawfully awarding contracts at the behest of influence peddlers called "placement agents." Believing plaintiff to be "associate[d] with several businessmen and individuals" under investigation, defendant Joseph Dear, CalPERS chief investment officer at the time, informed plaintiff's two partners that CalPERS would not award the Centinela entities a third fund to manage as long as plaintiff was still an active participant in those entities. Plaintiff subsequently signed a Separation Agreement withdrawing from the Centinela entities, but allowing him to receive his share of the Centinela entities' earnings from managing the two existing CalPERS funds.

2

Although CalPERS had no problem continuing to work with plaintiff's Latino partner who had no association with the influence peddlers under investigation, plaintiff alleges that CalPERS's and Dear's (collectively, defendants') actions were due solely to racial animus—namely, an avowed desire not to do business with "anyone whose name ends with an 'ez.'" Plaintiff therefore sued CalPERS and Dear for $30 million. He alleged that the defendants: (1) "discriminat[ed] against, or grant[ed] preferential treatment to, any individual . . . on the basis of race," in violation of article I, section 31 of the California Constitution; (2) intentionally interfered with the two contracts that created (and divided the profits from) the Centinela Investment Partners LLC and Centinela Group LLC; (3) intentionally interfered with a prospective economic advantage by preventing plaintiff from sharing in any profits from a third CalPERS fund and from other fund management opportunities in Texas, Michigan and Rhode Island; and (4) negligently interfered with the same prospective economic advantages.

Defendants demurred and moved to strike the initial complaint. The trial court sustained the demurrer in its entirety, denying leave to amend on the constitutional claim and granting leave to amend on the remaining tort claims.[1] Plaintiff filed a more detailed first amended complaint (FAC) re-alleging his three tort claims. The trial court again sustained the defendants' demurrers to the entire FAC, denying leave to amend on the claims alleging interference with a prospective economic advantage and granting leave to amend on the interference with a contractual relation claim.

Plaintiff stipulated to the entry of judgment as to the contractual interference claim, and filed this timely appeal.

## DISCUSSION

A demurrer tests the legal sufficiency of a complaint's allegations (*Satyadi v. West Contra Costa Healthcare Dist.* (2014) 232 Cal.App.4th 1022, 1028 (*Satyadi*)), not whether the plaintiff will eventually be able to prove them (*Kwikset Corp. v. Superior*

---

[1] Plaintiff sought a writ of mandate to overturn this ruling, which we denied without an opinion.

*Court* (2011) 51 Cal.4th 310, 328, fn. 11). In ruling on a demurrer, a court must accept as true all of the operative complaint's allegations, as well as all matters contained in exhibits attached to that complaint and any matters subject to judicial notice. (*Satyadi*, at p. 1028; *Orthopedic Specialists of Southern California v. Public Employees' Retirement System* (2014) 228 Cal.App.4th 644, 647-648 (*Orthopedic Specialists*)). The court need not accept the complaint's contentions, deductions or conclusions of fact or law. (*Lin v. Coronado* (2014) 232 Cal.App.4th 696, 700 (*Lin*).) The court must give the complaint a "reasonable interpretation." (*Satyadi*, at p. 1028.) On appeal of a demurrer, we independently assess the complaint's sufficiency (*ibid.*), but review for an abuse of discretion the trial court's denial of leave to amend (*Lin*, at p. 701). That discretion is abused if "there is a reasonable possibility that the defect can be cured by amendment." (*Ibid.*)

## I.      Article I, section 31 (Proposition 209) claim

The trial court's order sustaining the demurrer to plaintiff's claim for discrimination under article I, section 31 of the California Constitution (section 31) did not contain any reasoning, and the parties did not transcribe the hearing on that demurrer. On appeal, defendants defend the order on the ground that section 31 prohibits *preferential treatment* of minorities, women and other protected groups, not *discrimination* against them. Plaintiff contends that section 31's plain language encompasses both, and thus reaches his discrimination claim.

Section 31 provides, in pertinent part, that "[t]he State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education or public contracting." (Cal. Const., art I, § 31, subd. (a).) The voters added this provision to the California Constitution in 1996 when they passed Proposition 209. (*Id.*, History.)

At the time Proposition 209 passed, the California Constitution already guaranteed "the equal protection of the laws." (Cal. Const., art. I, § 7, subd. (a).) That guarantee broadly prohibited the state from discriminating on the basis of race, but tolerated

4

programs that granted preferences to minorities, women and other protected groups as long as those programs were narrowly tailored to serve a compelling state interest of remedying past discrimination. (*C&C Construction, Inc. v. Sacramento Municipal Utility Dist.* (2004) 122 Cal.App.4th 284, 293 (*C&C Construction*); *Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 35 (*Connerly*).) Proposition 209 altered our state's equal protection jurisprudence by flatly prohibiting the "race- and gender-conscious preferences" that our equal protection clause used to permit. (*Coral Construction, Inc. v. City & County of San Francisco* (2010) 50 Cal.4th 315, 322 (*Coral Construction*); see also *Connerly*, at p. 42.) However, Proposition 209's ban on preferential treatment programs is not absolute; such programs are still allowed if they (1) favor one sex over another, if tied to a bona fide occupational qualification (Cal. Const., art. I, § 31, subd. (c)), (2) were contained in a court order or consent decree in place at the time Proposition 209 became effective (*id.*, § 31, subd. (d)), or (3) are necessary to ensure eligibility for federal funding (*id.*, § 31, subd. (e)).

Plaintiff offers two reasons why his claim alleging that defendants discriminated against him because he is Latino is actionable under section 31. He first asserts that section 31's text broadly prohibits the state, while engaged in public contracting, from "*discriminat[ing] against*, or grant[ing] preferential treatment to, *any individual or group on the basis of race . . .*" (Cal. Const., art. I, § 31, subd. (a), italics added.) Plaintiff observes that our Supreme Court has defined the term "discriminate" in section 31 to mean "'mak[ing] distinctions in treatment; [or] show[ing] partiality (in favor of) or prejudice (against).'" (*Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 559-560 (*Hi-Voltage*), italics omitted); *Coral Construction*, *supra*, 50 Cal.4th at p. 327 fn.6.)[2] Plaintiff concludes that section 31's language, on its face and as interpreted

---

[2] The Legislature attempted to engraft its own definition of "discrimination" onto section 31 when it enacted Government Code section 8315, but this provision has been declared invalid as an improper incursion into the judicial territory of interpreting constitutional provisions. (*C&C Construction*, *supra*, 122 Cal.App.4th at p. 302.)

by the courts, plainly prohibits defendants' race-driven efforts to force him out of the Centinela entities.

We disagree that section 31's plain language is unambiguous and subject only to plaintiff's interpretation. To be sure, section 31 can be read as plaintiff suggests—that is, as a reaffirmation of the already existing prohibition against race-based discrimination found elsewhere in our Constitution. But section 31 can also be read more narrowly to prohibit the discrimination against unprotected groups that flows inexorably from the preferential treatment of protected groups; in other words, section 31 can be read to prohibit only the discrimination that is the flip side of the preferential treatment coin. Our Supreme Court has acknowledged this reading of section 31. (*Hi-Voltage*, *supra*, 24 Cal.4th at p. 560 [striking down program because it "affords preferential treatment to [minority- and women-owned] subcontractors on the basis of race or sex, . . . and discriminates on the same bases against non-[minority and women] subcontractors."].)

Because section 31's language is susceptible to two reasonable interpretations, it is ambiguous. (See, e.g., *Ceja v. Rudolph & Sletten, Inc.* (2013) 56 Cal.4th 1113, 1119.) When a voter-enacted provision is ambiguous, we may look to other indicia of the electorate's intent, including the analysis and arguments contained in the official ballot pamphlets. (*American Civil Rights Foundation v. Berkeley Unified School Dist.* (2009) 172 Cal.App.4th 207, 216.) It is undisputed that the sole intent behind Proposition 209 (and thus section 31) was to eliminate affirmative action and other preferential treatment programs, not to reenact the equal protection-based bar against discriminating against protected groups that already existed elsewhere in our Constitution. (*Hi-Voltage*, *supra*, 24 Cal.4th at p. 542 ["it is clear the voters intended to . . . [prohibit preferential treatment]"]; *Coral Construction*, *supra*, 50 Cal.4th at pp. 326-327 [official ballot statement indicated that purpose was to eliminate preferential treatment programs]; *Coalition for Economic Equity v. Wilson* (9th Cir. 1997) 122 F.3d 692, 696 [same], overruled on other grounds by *Winter v. Natural Resources Defense Council* (2008) 555 U.S. 7 (*Coalition for Economic Equity*).) In light of this purpose, we construe section 31 to prohibit affirmative action programs not excepted from its reach (and the

6

discrimination that is their necessary by-product), and not to reach the more conventional form of discrimination against protected groups.

Plaintiff's second argument is that we *must* adopt his broad reading of section 31, or else it is unconstitutional. Plaintiff relies upon the so-called "political structure" doctrine, which is an aspect of equal protection that prohibits a state from reallocating legislative power in a way that burdens the equal protection rights of protected groups. (*Coral Construction*, *supra*, 50 Cal.4th at p. 329; *Hunter v. Erickson* (1969) 393 U.S. 385, 389-392 [amendment to city charter to require majority voter approval of any race-related housing law, instead of allowing city councils to pass such laws; violation of political structure doctrine]; *Washington v. Seattle School Dist. No. 1* (1982) 458 U.S. 457, 479-480 [referendum requiring constitutional amendment to authorize race-related school busing programs, instead of allowing local school boards to adopt such programs; violation of political structure doctrine].) More specifically, plaintiff contends that section 31 reallocates legislative power by barring preferential treatment programs (absent a further constitutional amendment) that state and local governments used to be able to adopt on their own. Plaintiff reasons that the only way section 31's reallocation of legislative authority can be valid under the political structure doctrine is if section 31 bars *all* discrimination—preferential or not. He argues that our Supreme Court held as much in *Coral Construction.*

We are unpersuaded. *Coral Construction* rejected a "political structure"-based challenge to section 31, but not on the grounds plaintiff recounts. Instead, *Coral Construction* determined that section 31 did not offend the "political structure" doctrine because its abolition of preferences—which are themselves "presumptively unconstitutional"—did not "burden[] the right to equal treatment." (*Coral Construction*, *supra*, 50 Cal.4th at pp. 328-332.) This is the same reasoning cited by every other court to consider and reject a "political structure"-based challenge to section 31. (E.g., *Coalition for Economic Equity*, *supra*, 122 F.3d at pp. 704-708; *Coalition to Defend Affirmative Action v. Brown* (9th Cir. 2012) 674 F.3d 1128, 1131-1136.) None of these

7

decisions have turned on (or, for that matter, looked to) whether section 31 protected conventional discrimination as well as preferential treatment.

For these reasons, we agree with the trial court that plaintiff has not stated a claim under section 31 because he is not challenging a preferential treatment program.

However, the substance of plaintiff's claim is that he was the victim of racial discrimination. We accordingly invited the parties under Government Code section 68081 to file supplement briefing as to whether plaintiff could amend his complaint to plead a cause of action under our State constitution's general equal protection clause. (Art. I, § 7, subd. (a).) Although a violation of this provision does not support a prayer for damages (*Gates v. Superior Court* (1995) 32 Cal.App.4th 481, 516), our review of the supplemental letters leads us to conclude that plaintiff can state a prayer for appropriately tailored injunctive relief.[3] Because a reasonable possibility that the defect in plaintiff's pleading can be cured by amendment, he must be afforded an opportunity to amend his complaint on remand.

## II.     Interference with contractual relations claim

The trial court cited two reasons when it sustained the demurrer to plaintiff's claim against defendants for intentional interference with the two profit-sharing contracts: (1) CalPERS was a "part of the Agreements" and could not be sued under the rule that a defendant is not liable in tort for interfering with contracts to which it is a party; and (2) plaintiff's voluntary decision to sign the Separation Agreement barred his claim. Plaintiff asserts the trial court was wrong on both counts, and we agree.

With respect to the first ground, a party to a contract may sue a third party for the tort of intentionally interfering with the performance of that contract. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 513-514 (*Applied Equipment*), quoting *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126.) This tort remedy is not available against other parties to the disrupted

---

[3]     In making this observation, we express no position on the permissible scope of the sought-after injunctive relief or its substantive merit. Those are matters for the trial court to address in the first instance.

contract or against the agents of those parties.  (*Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 262 (*Kasparian*); *PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55, 65 (*PM Group*).)  There is good reason for this limitation:  The putative tort plaintiff already has a breach-of-contract remedy against other parties to the contract (*Kasparian*, at p. 262; *Applied Equipment*, at pp. 510, 516-517), and the potential liability for breach of contract provides adequate incentive for parties not to disrupt their own contracts (cf. *Della Penna v. Toyota Motor Sales, U.S.A.* (1995) 11 Cal.4th 376, 392 [tort exists to discourage non-parties from meddling with "formally cemented economic relationship[s]"]).

    *Applied Equipment* narrowly held that a plaintiff could not plead around the longstanding limitation against suing another party to a contract by alleging a civil conspiracy to disrupt a contract involving that party and a non-party.  (*Applied Equipment*, *supra*, 7 Cal.4th at pp. 516-517.)  However, the language the court used in describing the limitation was imprecise.  *Applied Equipment* stated that a claim for intentional interference with contractual relations could not be brought against other parties to the allegedly disrupted contract (*id.* at p. 514), but went on to observe that the tort could be alleged against "strangers" to the contract and "outsiders who have no legitimate social or economic interest in the contractual relationship."  (*Id.* at pp. 513-514.)  This language raised the question:  Can the tort be alleged against a non-party to a contract if that non-party is not a "stranger" to the contract?

    The California Courts of Appeal have by and large consistently read *Applied Equipment*'s references to "strangers" and "outsiders" as being synonymous with non-parties, and have entertained tortious interference claims against persons or entities who are not parties to the allegedly disrupted contracts (or those parties' agents), irrespective of what relationship those non-parties might have to the contractual relationship or to the parties to the contract.  (*Woods v. Fox Broadcasting Sub., Inc.* (2005) 129 Cal.App.4th 344, 350, 353 (*Woods*); *Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp.* (2013) 221 Cal.App.4th 867, 883-887; *Asahi Kasei Pharma Corp. v. Actelion Ltd.* (2013) 222 Cal.App.4th 945, 962, 965 [*Asahi Kasei Pharma Corp.*]; but see *Marin Tug & Barge,*

9

*Inc. v. Westport Petroleum, Inc.* (9th Cir. 2001) 271 F.3d 825, 832 [barring tortious interference claims against parties as well as non-parties with a "direct interest or involvement in the contractual relationship"].)

Under this rule, plaintiff may sue CalPERS and Dear for tortious interference with a contract. CalPERS is a party to several contracts with many of the Centinela entities owned by Centinela Holdings LLC and Centinela Capital Partners LLC. Critically, however, CalPERS is not a party to the agreements that created Centinela Holdings LLC and Centinela Capital Partners LLC in the first place—and *those* are the only agreements plaintiff alleges CalPERS disrupted. Moreover, Centinela Holdings LLC's and Centinela Capital Partners LLC's ownership interests in the other Centinela entities does not make them parties to the downstream contracts between their progeny and CalPERS. (See *Woods*, *supra*, 129 Cal.App.4th at p. 350, 353; *Asahi Kasei Pharma Corp.*, *supra*, 222 Cal.App.4th at p. 962; but see *Kasparien*, *supra*, 38 Cal.App.4th at p. 266 [concluding, without any discussion, that individual owners of contracting parties are immune from suit for tortious interference with a contract].) This result makes sense because CalPERS's interest in the investment ventures confers no interest in how the two upstream Centinela entities divide up their share of the profits from these ventures. Because neither CalPERS nor Dear is a party to the contracts they are alleged to have disrupted, the trial court erred in sustaining the demurrers to this claim on this ground.

The trial court also erred in placing dispositive weight on the Separation Agreement. To be sure, the Separation Agreement recites that plaintiff signed it voluntarily. CalPERS argues that the Separation Agreement's recitals should trump any inconsistent allegations in the complaint. (*Orthopedic Specialists*, *supra*, 228 Cal.App.4th at pp. 647-648 [exhibits attached to complaint trump inconsistent allegations in complaint].) In this case, there is no inconsistency because plaintiff alleges that the *entire Separation Agreement*, including its recital of voluntariness, was signed under duress. Indeed, if the rule were otherwise, no contract with a voluntariness recital could ever be challenged as invalid due to duress. CalPERS also argues that plaintiff was not subject to duress because he can still sue CalPERS for damages; for support, CalPERS

10

cites *River Bank America v. Diller* (1995) 38 Cal.App.4th 1400.  However, *River Bank America* held only that a person's consideration of business and economic realities in making a decision does not, for that reason alone, render that decision involuntary.  (*Id.* at p. 1425.)  Plaintiff here has alleged more than business and economic realities as the reason for signing the Separation Agreement; he has alleged duress.

CalPERS alternatively contends that plaintiff's acceptance of residual profits under the Separation Agreement forecloses his right to sue defendants.  We disagree.  Plaintiff is not suing his partners for how they treated him under the Separation Agreement; he is suing CalPERS and Dear for engaging in tortious conduct that pressured him to swap the more lucrative benefits he was entitled to under the original Centinela profit-sharing agreements for less lucrative benefits under the Separation Agreement.  The tort of intentional interference with a contract requires only "disruption" of a contractual relationship—not the total loss of all benefits flowing from that relationship.  (See *Asahi Kasai Pharma Corp.*, *supra*, 222 Cal.App.4th at p. 958.)  Plaintiff has consequently alleged enough to surmount a demurrer.  (See *Hannigan v. Sears, Roebuck & Co.* (7th Cir. 1969) 410 F.2d 285, 290-291 [plaintiff coerced into modifying a contract in an unfavorable manner can sue for intentional interference with that contract].)

In sum, the trial court erred in sustaining the demurrers to this claim.

III.    **Interference with prospective economic advantage claims**

The trial court sustained demurrers to plaintiff's claims for intentional and negligent interference with a prospective economic advantage on the grounds that (1) defendant alleged only the loss of "current" business, and not the loss of any "prospective" business, and (2) plaintiff did not allege that defendants engaged in any "independently wrongful act" (as required for this tort) because plaintiff's section 31 claim had been dismissed and CalPERS could not be sued under the Unruh Act, Civil Code section 51.5.  The first ground is not supported by the record because the FAC alleges that plaintiff and Centinela lost the opportunity to do investment work for other states as well as future work for CalPERS.

11

In light of our ruling in section I above, we need not reach the trial court's second basis for granting the demurrers to these claims. The tort of interference with prospective economic advantage requires a plaintiff to allege, among other things, that the defendant engaged in an "independently wrongful" act. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159 (*Korea Supply Co.*).) An "independently wrongful" act is one that is "proscribed by some constitutional, statutory, regulatory, common law or other determinable legal standard." (*Ibid.*) Plaintiff alleged two possible wrongful acts in his FAC: (1) the denial of his right to pursue his profession as a investment advisor, in violation of article I, section 8 of the California Constitution; and (2) racial discrimination by a "business establishment," in violation of the Unruh Act. Because we are remanding this case to allow plaintiff to allege a violation of the constitutional right to equal protection, we must also allow him to allege this same violation as an independently wrongful act as part of his interference with prospective business advantage claims. Because we do not know if plaintiff will continue to allege violations of article I, section 8 or the Unruh Act, any ruling by us as to the viability of those allegations—particularly when the trial court ruled on only one of them—would be premature.

## IV.    Remaining arguments

### A.    *Litigation privilege*

Defendants argue that plaintiff's entire lawsuit is barred by the litigation privilege because Dear's misgivings about plaintiff's continued involvement with the Centinela entities stemmed from plaintiff's association with people under investigation by the Attorney General. To be sure, the litigation privilege precludes liability based on any publication "made . . . in any . . . official proceeding authorized by law" (Civ. Code, § 47, subd. (b)(3)), including investigations by the Attorney General (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 930). But Dear's comment was a communication *about* an official proceeding, not a comment made *in* such a proceeding. It is consequently outside the privilege. (Accord, *Nguyen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140,

147 [to fall under section 47, a communication must "be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the action"].)

## B. Governmental immunity

Defendants further contend that their actions regarding plaintiff were "the result of the exercise of discretion" and consequently within the embrace of governmental tort immunity. (Gov. Code, § 820.2 [public employees are immune for discretionary decisions]; *id.*, § 815.2, subd. (b) [public entities are immune "where the employee is immune from liability"].) Under this statute, "'[i]mmunity is reserved for those "basic policy decisions [which have] . . . been [expressly] committed to coordinate branches of government."'" (*Barner v. Leeds* (2000) 24 Cal.4th 676, 685, quoting *Caldwell v. Montoya* (1995) 10 Cal.4th 972, 981.) However, "there is no basis for immunizing lower level decisions that merely implement a basic policy already formulated." (*Ibid.*) Applying these principles, a public agency's decision to award a public contract to a specific bidder falls on the "basic policy decision" side of the line; the agency is immune from tort liability for that decision. (*Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 649.) By contrast, an agency's decision regarding who should be involved in implementing a public contract awarded long ago involves implementation, and is consequently outside the reach of section 820.2. Plaintiff's claims entail the latter type of decision, so defendants are not immune.

## C. Timeliness of claim

Defendants finally assert that plaintiff's complaint must be dismissed because he did not, as the Government Claims Act requires, present his claim for "money or damages" to the Victim Compensation and Government Claims Board within six months of the accrual of the causes of action in his complaint. (Gov. Code, §§ 905.2, 945.4, 901, 911.2, subd. (a).) Plaintiff filed his claim on March 29, 2012. Defendants argue that this was untimely for two reasons, neither of which has merit.

First, defendants contend that plaintiff's claims accrued 13 months earlier, when Dear first mentioned CalPERS's desire to have the Centinela entities disassociate themselves from plaintiff. However, each of plaintiff's claims requires proof of damage

13

(*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1239 [intentional interference with contractual relations]; *Korea Supply Co.*, *supra*, 29 Cal.4th at p. 1153 [intentional interference with prospective economic advantage]), and plaintiff was not damaged until he actually severed his ties with the Centinela entities.

Second, defendants argue that plaintiff severed those ties when he signed the Separation Agreement on August 22, 2011, which is more than six months before March 29, 2012.  However, it is unclear from the documents available to us on demurrer whether plaintiff was damaged on that date or instead on September 30, 2011 (which would make the claim timely), because (1) the Separation Agreement contemplated that plaintiff would remain involved in the Centinela entities until the September date, and (2) the First Amendment Complaint alleged the September date as the Agreement's effective date.

Our uncertainty on this point is ultimately irrelevant because defendants have waived untimeliness as a defense.  Government Code section 911.3 obligates a public agency to inform a person who files an untimely claim that (1) his claim is outside the six month window, (2) no action will be taken on that claim, (3) the person's only recourse is to apply for leave to file a late claim, and (4) the person may want to consult an attorney.  (Gov. Code, § 911.3, subd. (a).)  If the specific notice provided for in the statute (or its "substantial[]" equivalent) is not given, the public agency is deemed to waive the untimeliness of the claim as a defense.  (*Id.*, § 911.3, subd. (b).)  In this case, defendants informed plaintiff that his "claim is being accepted only to the extent it asserts allegations that arise from facts or events that occurred during the six months prior to the date it was presented."  This statement is missing several of the necessary advisements, and is accordingly ineffective to preserve defendants' untimeliness defense.  Defendants point us to *Gundy v. California Dept. of Corrections & Rehab.* (E.D. Cal. 2013) 2013 U.S. Dist. LEXIS 18185, at pages 26-27, as a case where a similar advisement was deemed sufficient, but *Gundy* does not cite section 911.3 or explain why the advisement satisfied the statute's terms.

14

# DISPOSITION

For the foregoing reasons, we reverse the judgment dismissing this lawsuit and remand the matter to permit the plaintiff to file a second amended complaint consistent with this opinion.

**<u>CERTIFIED FOR PUBLICATION.</u>**

_____, J.

HOFFSTADT

We concur:

_____, Acting P. J.

ASHMANN-GERST

_____, J.

CHAVEZ

15