Filed 6/10/21  Center for Genetics and Society v. Bonta CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CENTER FOR GENETICS AND SOCIETY et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> ROB BONTA, as Attorney General, <br><br>     Defendant and Appellant. | A159432 <br><br> (San Francisco City & County <br>     Super. Ct. No. CPF18516440) |

**INTRODUCTION**

Plaintiffs, the Center for Genetics and Society, Equal Justice Society, and Pete Shanks (a consultant for the Center for Genetics and Society and commentator on the use of forensic DNA and data bases), challenge the validity of the DNA and Forensic Identification Database and Data Bank Act of 1998 (DNA Law) (Pen. Code, § 295 et seq.) with respect to arrestees who are not charged with, or who are not convicted of, a criminal offense.  They do not challenge the statutory requirement that DNA samples be taken from certain arrestees.  Rather, they maintain analyses of these samples and the uploading of profiles must be delayed, because the government assertedly has no legitimate interest in analyzing DNA samples from arrestees who are not charged, whose arrest is determined to be invalid, or as to whom criminal

1

charges are dismissed.  They further maintain the statutory provisions for expungement are inadequate and "automatic" expungement of DNA information is required for arrestees "who are never convicted and have no prior qualifying convictions."  They ground both claims in our state constitutional right to privacy and prohibition against unreasonable searches and seizures.

Relying on *Maryland v. King* (2013) 569 U.S. 435 (*King*), *People v. Buza* (2018) 4 Cal.5th 658 (*Buza*), and other cases upholding the DNA Law against federal and state constitutional challenges, the defendants interposed a demurrer, which the trial court sustained without leave to amend.

While we conclude the trial court correctly sustained defendants' demurrer as to plaintiffs' first claim—that the analyses and uploading of DNA profiles must be delayed—we conclude they have met minimal pleading thresholds as to their second claim—that state constitutional privacy interests arguably may require more protections than are presently required by the current expungement provisions.  In so concluding, we express no opinion as to whether plaintiffs will ultimately succeed on the merits of their claim.

## BACKGROUND

### *California's DNA Act*

"For decades before the DNA Act, California law [] required the collection of biological samples from individuals convicted of certain offenses. In 1983, the Legislature enacted legislation requiring certain sex offenders to provide blood and saliva samples before their release or discharge.  (Stats. 1983, ch. 700, § 1, pp. 2680–2681, codified at Pen. Code, former § 290.2.)" (*Buza, supra,* 4 Cal.5th at p. 665.)

"In 1998, the Legislature enacted the DNA and Forensic Identification Data Base and Data Bank Act of 1998 (Stats. 1998, ch. 696, § 2, pp. 4571–4579), which required the collection of DNA samples from persons convicted

2

of certain felony offenses, including certain sex offenses, homicide offenses, kidnapping, and felony assault or battery.  (Pen. Code, former § 296, subd. (a).)"  (*Buza, supra,* 4 Cal.5th at p. 665.)

In 2004, through the passage of Proposition 69, DNA collection was "substantially expanded" to include sampling of "individuals who are arrested for any felony offense, as well as those who have been convicted of such an offense."  (*Buza, supra,* 4 Cal.5th at p. 665.)  "In its statutory findings and declarations of purpose, Proposition 69 explained that expansion of the DNA databank program was warranted to serve a 'critical and urgent need to provide law enforcement officers and agencies with the latest scientific technology available for accurately and expeditiously identifying, apprehending, arresting, and convicting criminal offenders and exonerating persons wrongly suspected or accused of crime.'  (Prop. 69, § II, subd. (b). . . .)  With respect to arrestees in particular, Proposition 69 declared:  'The state has a compelling interest in the accurate identification of criminal offenders . . .'; that 'DNA testing at the earliest stages of criminal proceedings for felony offenses will help thwart criminal perpetrators from concealing their identities and thus prevent time-consuming and expensive investigations of innocent persons'; and 'it is reasonable to expect qualifying offenders to provide forensic DNA samples for the limited identification purposes set forth in this chapter.'  (*Id.,* § II, subds. (e), (f), p. A-342.)"  (*Buza,* at p. 666.)

By 2009, the DNA Act provided, as it currently does, that "all adult felony arrestees 'shall provide buccal swab samples, right thumbprints, and a full palm print impression of each hand, and any blood specimens or other biological samples required pursuant to this chapter for law enforcement identification analysis.'  (Pen. Code, § 296, subd. (a).  Providing a buccal swab sample requires the arrestee to apply a swab to the inside of his or her cheek

to collect the 'inner cheek cells of the mouth,' which contain DNA. (*Id.*, § 295, subd. (e).) The statute provides that these specimens, samples, and print impressions shall be collected 'immediately following arrest, or during the booking . . . process or as soon as administratively practicable . . . but, in any case, prior to release on bail or pending trial or any physical release from confinement or custody.' (*Id.*, § 296.1, subd. (a)(1)(A).) Refusal to provide any of the required specimens is punishable as a misdemeanor. (*Id.*, § 298.1, subd. (a).)" (*Buza, supra,* 4 Cal.5th at p. 666.)

"Collected DNA samples are sent to California's Department of Justice DNA Laboratory (DNA Laboratory) for forensic analysis. (Pen. Code, §§ 295, subds. (f), (g), (i)(1)(C), 295.1, subd. (c).) The laboratory uses the samples to create a unique DNA identification profile, using genetic loci that are known as 'junk' or 'noncoding' DNA, because the loci have no known association with any genetic trait, disease, or predisposition. (See *King, supra,* 569 U.S. at pp. 442–443, 445.) This profile is stored in California's DNA databank. California's DNA databank is part of the Combined DNA Index System (CODIS), a nationwide database that enables law enforcement to search DNA profiles collected from federal, state, and local collection programs. (See *ibid.*; Pen. Code, § 299.6, subd. (b); Cal. Dept. of Justice, Bureau of Forensic Services, Laboratory Services, DNA Analysis, <https://oag.ca.gov/bfs/services> [as of Apr. 2, 2018].) DNA profiles stored by the DNA Laboratory may be accessed by law enforcement agencies. (Pen. Code, § 299.5, subd. (f).) The DNA Laboratory must 'store, compile, correlate, compare, maintain, and use' DNA profiles for forensic casework, for comparison with samples found at crime scenes, and for identification of missing persons. (*Id.*, § 295.1, subd. (c).)" (*Buza, supra,* 4 Cal.5th at pp. 666-667.)

4

"Information obtained from an arrestee's DNA is confidential and may not be disclosed to the public.  (Pen. Code, § 299.5.)  DNA samples and the biological material from which they are obtained may not be used 'as a source of genetic material for testing, research, or experiments, by any person, agency, or entity seeking to find a causal link between genetics and behavior or health.'  (*Id.*, § 295.2.)  Any person who knowingly uses a DNA sample or profile for any purpose other than 'criminal identification or exclusion purposes' or 'the identification of missing persons,' or who 'knowingly discloses DNA or other forensic identification information . . . to an unauthorized individual or agency' for any unauthorized reason is subject to criminal prosecution and may be imprisoned for up to three years and fined up to $10,000.  (*Id.*, § 299.5, subd. (i)(1).)  The Department of Justice (DOJ) is also subject to civil damages for knowing misuse of a sample or profile by any of its employees.  (*Id.*, § 299.5, subd. (i)(2)(A).)"  (*Buza, supra,* 4 Cal.5th at p. 667.)

"The DNA Act provides that if an arrestee is cleared of charges and there is no other basis for keeping the information, the arrestee 'shall have his or her DNA specimen and sample destroyed and searchable database profile expunged from the databank program.'  (Pen. Code, § 299, subd. (a).)  An arrestee may request expungement if he or she is released without being charged, if all qualifying charges against the arrestee are dismissed, or if the arrestee is found not guilty or factually innocent of all qualifying charges.  (*Id.*, § 299, subd. (b).)  The federal legislation establishing CODIS likewise requires participating states to 'promptly expunge' the DNA profile of any person who is cleared of qualifying charges.  (34 U.S.C. § 12592(d)(2)(A).)"  (*Buza, supra,* 4 Cal.5th at p. 667.)

To facilitate the expungement process, the Judicial Council has developed a form request and order.  (Cal. Judicial Council form CR-186/JV-798,

*Order for Expungement of DNA Profiles and Samples* <https://fill.io/CR-186-JV-798-ORDER-FOR-EXPUNGEMENT-OF-DNA-PROFILES-AND> [as of June 10, 2021].) The DOJ has also created a form and established an expedited process that does not require any court involvement. (Cal. DOJ form DLE 244, *Streamlined DNA Expungement Application Form* <https://oag.ca.gov/sites/all/files/agweb/pdfs/bfs/expungement_app.pdf> [as of June 10, 2021].)

### *The Instant Lawsuit*

Plaintiffs challenge the validity of the DNA Act in two respects, and seek declaratory, injunctive, and writ relief. Acknowledging that none "of them has been personally affected by the DNA Program," they sue as mandamus petitioners with "public-interest" standing, and plaintiff Shanks also sues as a "taxpayer."

They first claim the analysis of DNA samples taken from felony arrestees taken at booking and the uploading profiles must be delayed until charges are filed, a judicial officer makes a determination the arrest was supported by probable cause, and prosecution proceeds. They secondly maintain the statute must require "automatic" expungement of DNA information for arrestees "who are never convicted and have no prior qualifying convictions."

Plaintiffs allege that approximately one-third of felony arrests do not result in a conviction for a variety of reasons—charges are never filed, charges are dismissed, or defendants are acquitted.[1] They also assert the

---

[1] Plaintiffs base many of their allegations, including their numerical and statistical assertions, in part, on the dissenting opinions in *Buza*. (*Buza, supra,* 4 Cal.5th at pp. 695, 697-698 (dis. opn. of Liu, J.), 705 (dis. opn. of Cuéllar, J.).) They also cite to a 2015 law review article and seek judicial notice of several California Department of Justice publications and

6

taking of DNA samples is of no, or little, utility. On arrest, individuals are finger-printed, and regulations require law enforcement to use these prints to identify the arrestee and recover his or her criminal history, if any, to determine whether a DNA profile is already in the system. If it is not, only then is a DNA sample obtained. They allege it currently takes at least a week for a sample to be analyzed, and that analysis proceeds even if an individual is released without charges being filed, or a judicial officer invalidates the arrest for lack of probable cause, or charges are later dismissed. Once a profile is uploaded, it is accessible nationwide and is accessed, searched, and compared with millions of other DNA samples collected in any context by law enforcement. Plaintiffs allege these searches occur at least once a week.

With respect to expungement, plaintiffs allege the state has granted 1,282 requests for expungement and this number "most likely" represents less than one percent of the "tens or hundreds of thousands of samples" eligible for expungement. They maintain the expungement process places " 'a significant burden' " on eligible individuals and many are unaware that such a process exists, as there is no requirement that they be so advised. In contrast, DNA obtained from "suspect samples" are automatically purged from the federal Department of Justice CODIS system if a state investigating agency does not notify the federal Department within two years. Plaintiffs allege that because the DNA Law does not call for automatic expungement of DNA records and because there is no requirement that arrestees be advised

_____

legislation passed prior to *Buza* but which will never go into effect, given the high court's ruling in that case. Defendants object to plaintiffs' factual recitation to the extent it goes outside the allegations of their complaint and oppose their request for judicial notice. As we shall discuss, the documents as to which judicial notice is sought are not material to our disposition, and we therefore deny plaintiffs' request.

7

of the expungement provisions, "only a tiny percentage" of individuals eligible to have their DNA information expunged complete the process. Plaintiffs further maintain the process is unduly burdensome and lengthy, and that "even minor transactional burdens" significantly discourage eligible individuals from seeking expungement.

Plaintiffs also contend there is significant distinction between the retention of fingerprints and a DNA sample. "DNA analysis can reveal a vast array of highly private information, including familial relationships, ethnic traits and other physical characteristics, genetic defects, and propensity for certain diseases," and perhaps other information, as well, such as personality traits, propensity for antisocial behavior, sexual orientation, and future health conditions. They further allege profiles can be used to identify an arrestee's family members, and while California policy prohibits this practice, they posit the policy could change without public notice.

Plaintiffs additionally allege that individuals are mistakenly implicated due to contaminated crimes scenes and laboratory mistakes. They further maintain that adding of DNA profiles "based solely on an arrest, combined with the lack of expungement, may serve to exacerbate racial disparities in the criminal justice system," given arrest statistics.

Relying on *King, Buza,* and *Haskell v. Brown* (N.D. Cal. 2018) 317 F.Supp.3d 1095 (*Haskell*) (granting judgment on the pleadings, following our high court's decision in *Buza*, on similar challenges to the DNA Law), the defendants filed a demurrer, which the trial court sustained, agreeing these and like cases were dispositive. Since plaintiffs "disclaimed any intention to amend their claims," the court sustained the demurrer without leave to amend and dismissed the case.

8

**DISCUSSION**[2]

*Delaying Analysis of DNA Samples and Uploading Profiles*

In *Buza,* our high court addressed and rejected a like argument that the DNA Law is constitutionally infirm and the analysis of DNA samples and uploading of profiles must be deferred until charges have been filed, a judicial officer has made a probable cause determination, and the prosecution moves forward.

The defendant in *Buza* was both arrested and convicted of a serious felony offense. When he thereafter refused to provide a DNA sample, he was convicted of violating the DNA Law. (*Buza, supra,* 4 Cal.5th at p. 664.) On appeal from the latter conviction, he challenged the DNA Law in several respects. (*Id.* at p. 665.) And in doing so, he relied heavily on three differences between our DNA Law and the Maryland DNA statute the United States Supreme Court upheld against constitutional challenge in *King, supra,* 569 U.S. 435. The defendant in *Buza*, as do plaintiffs here, maintained these differences warranted a different outcome, both as a matter of federal and state constitutional law. (*Buza,* at pp. 673-674.)

One of these differences was that the Maryland law authorized the collection of DNA samples only from arrestees "charged" with an offense and did not permit testing and uploading a profile into the state's database until

---

[2] Our standard of review of a dismissal following the sustaining of a demurrer is well-established. " 'In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.' [Citation.] ' " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. . . . We also consider matters which may be judicially noticed." . . . Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' " ' [Citation.]" (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 768.)

9

after the arrestee was arraigned and a judicial officer determined probable cause supported the arrest. (*Buza, supra,* 4 Cal.5th at pp. 675-676.) Our Supreme Court held the fact California's DNA statute provides for taking a sample " 'immediately following arrest' " (i.e., at booking) and does not defer analysis and uploading results, does not render the statute constitutionally infirm.[3] (*Buza,* at pp. 676-679.)

"*King* approved 'DNA identification,' " said our high court, which "necessarily involves both taking and analyzing the sample—as a 'legitimate police booking procedure' that enables law enforcement to know whom they have in custody. (*King, supra,* 569 U.S. at pp. 465, 466.) That interest is one that attaches as soon as the suspect is 'formally processed into police custody.' (*Id.* at pp. 449–450.) The [*King*] court attached no significance to the timing provision of the Maryland statute on which defendant relies." (*Buza, supra,* 4 Cal.5th at p. 677.)

The court next rejected the defendant's assertion, which plaintiffs also make here, "that the timing of analysis nevertheless ought to figure in the equation because, as a practical matter, officers ordinarily will not receive a suspect's DNA profile until well after booking in any event." (*Buza, supra,* 4 Cal.5th at p. 677.) The defendant argued, as plaintiffs do here, "that in view of the delays already associated with sample processing, it would pose a negligible burden for officials to postpone processing until a judge has determined whether probable cause exists and a prosecutor has decided whether to file charges." (*Id.* at p. 678.)

---

[3] After pointing out the defendant had not, in the trial court, advanced the argument the DNA Law is infirm because analysis of samples and uploading profiles is not delayed (*Buza, supra,* 4 Cal.5th at p. 677), the high court nevertheless went on to explain why the argument lacked traction.

Our high court acknowledged that "in California it has typically taken much longer"—at the time of briefing in *Buza* an average of 30 days—to "generate an identification profile from an arrestee's DNA sample." (*Buza, supra,* 4 Cal.5th at p. 677.) But, said the court, the "[d]efendant's point about average processing times is not one that escaped the [] court's notice in *King*; as noted, the court itself cited the same numbers. The court nevertheless concluded that DNA identification is a reasonable booking procedure, without suggesting that its reasonableness might vary depending on average processing times. The reasons for this are not difficult to discern. For one thing, individual DNA samples may be processed more quickly than average: The court noted the states' submission that some DNA identification samples in California have been processed significantly more quickly than others. [Citation.] Moreover, as is often the case in areas of fast-moving technological developments, average processing times are liable to change; the high court had been told that the technological capacity already exists to analyze DNA samples in a matter of minutes, rather than days or weeks, and that technology is likely to become more widespread in the near future." (*Id.* at p. 678.) (As we have recited, in the instant case, plaintiffs allege processing "takes at least a week.") "Given all this," the court concluded it could not "proceed on the assumption that a rule delaying the collection or processing of samples until after a judicial probable cause finding or arraignment would pose no meaningful risk of interference with the central interest identified in *King*: the accurate identification of arrestees who are taken into police custody." (*Ibid.*)

Our high court also acknowledged the concern raised by the defendant "about the collection of DNA samples from [] individuals[, unlike himself,] who are booked into custody but who ultimately will never be charged with a

11

qualifying crime, or against whom qualifying charges will ultimately be dismissed." (*Buza, supra,* 4 Cal.5th at p. 679.) However, the "[v]oters responded to that concern by providing for a particular remedy—expungement of the DNA sample and associated records—when the suspect is cleared of qualifying charges. As *King* illustrates, voters could also have chosen to require that all sample processing be postponed until after arraignment, regardless of technological capacity to proceed more quickly. But given the basic logic of *King*, we cannot say that the choice voters made is one that undermines the reasonableness of the search in this case." (*Ibid.*)

As plaintiffs point out, the *Buza* court stated several times it was addressing the constitutionality of the DNA Law only in the context of the defendant before it, namely a defendant who was validly arrested, and was charged and convicted of a serious felony. (*Buza, supra,* 4 Cal.5th at p. 665 [court "express[es] no view on the constitutionality of the DNA Act as it applies to other classes of arrestees"]; see *id.* at pp. 675, 679.) Plaintiffs, in contrast, challenge testing and uploading profiles with respect to persons who are arrested but "released without charges or whose charges have been dismissed." Given the court's reasoning in *Buza*, however, this is not a distinction of consequence.

Our high court focused on the government's interests *at the time of arrest and booking* (*Buza, supra,* 4 Cal.5th at pp. 676-679, 687-689)—interests the court stated were significant (*id.* at pp. 687-689) and described only months later in another DNA case as "compelling." (*In re C.B.* (2018) 6 Cal. 5th 118, 132; see *id.* at pp. 132-133 ["Proposition 69 expands the state's databank to advance the compelling interests in public safety and appropriate exoneration through more accurate identification of criminals"; minor did not

12

contest "the compelling nature of the state's interest in properly prosecuting crimes and exonerating the innocent"].)

At the time of arrest and booking, whether a felony arrestee not arrested pursuant to a warrant (which was the case with the defendant in *Buza*) will be charged, and whether any felony arrestee will be prosecuted through trial, are unknowns. Thus, at the time of his warrantless arrest and booking, the defendant in *Buza* was in the same position as the arrestees whose interests plaintiffs advance here—whether a probable cause for arrest determination would be forthcoming, whether charges would be filed, and whether the prosecution against Buza would move forward to trial, were all unknowns.[4] (*Buza, supra,* 4 Cal.5th at pp. 667-668.) Accordingly, our high court's ruling and rationale in *Buza*—specifically, the court's rejection of the defendant's constitutional challenge based on the statute's failure to defer the analysis of DNA samples and uploading of profiles—is not only equally apropos, but binding on us as to the same challenge advanced here with respect to arrestees who are never charged, whose arrests are subsequently determined to have been unlawful, or as to whom charges are subsequently dismissed.

The federal district court in *Haskell* took this same view in rejecting a federal constitutional challenge to our state's DNA Law by individuals who were arrested for felony crimes and from whom DNA samples were taken, but against whom no charges were filed. (*Haskell, supra,* 317 F.Supp.3d at pp. 1097-1098.) After staying the case pending our high court's decision in *Buza,* the district court granted judgment on the pleadings, rejecting the

---

[4] In fact, dismissal of charges could occur just prior to trial, indicating that what plaintiffs are really advocating is that analysis and uploading of profiles must wait until a defendant is convicted.

13

plaintiffs' assertion that their situation was different from that of the defendants in *King* and *Buza* and therefore these cases were inapposite. (*Id.* at pp. 1098-1099.) As the district court observed, "[w]hen an individual is taken into custody, prosecutors have not yet determined whether that individual will be charged. Analyzing the government's interests at the time of booking, but with knowledge not available at the time of booking (i.e., that an individual will not subsequently be charged), is putting one's thumb on the scales. It also ignores the possibility that identifying information revealed by DNA analysis could actually guide a prosecutor's determination of <u>whether</u> to charge. <u>Buza</u> observed that '[e]ven if a DNA profile is not generated until weeks or months after the initial booking, the information it yields about the arrestee and his criminal history can still have an "important bearing" on the processing of an arrestee—whether, for example, to revisit an initial determination to release the arrestee or to impose new release conditions.' " (*Id.* at p. 1103, fn. omitted, quoting *Buza, supra,* 4 Cal. 5th at p. 689.) Thus, for the same reasons *King* and *Buza* rejected the argument that it is constitutionally impermissible to test a DNA sample and upload a profile until an arrestee is charged with a crime, a judicial officer has made a probable cause determination, and prosecution proceeds—the district court also rejected it. (*Haskell,* at pp. 1100-1108.)

Plaintiffs also claim, as did the defendant in *Buza,* that numerical and statistical data rebut the legitimacy of the government interests the United States Supreme Court identified in *King* and our high court identified in *Buza,* and both courts held outweigh an arrestee's personal interests, including privacy interests, in deferring the analysis of DNA samples and the uploading DNA profiles. (*Buza, supra,* 4 Cal.5th at p. 687.) This is the same data undergirding the dissenting opinions in *Buza.* (*Id.* at pp. 695, 697-698

14

(dis. opn. of Lui, J.), 705 (dis. opn. of Cuellar, J.).) And while it raises issues worthy of discussion, we are bound by the holding of the majority as to the constitutionality of the statute with respect to deferring analysis and posting of DNA profiles. (See *Haskell, supra,* 317 F.Supp.3d at p. 1104 [discussing government's "significant interest in identification of arrestees"—"both who they are and what they have done"].)

Plaintiffs also point out their challenge is based not only on article I, section 13 of the California Constitution prohibiting unlawful searches and seizures, but also on the right of privacy set forth in article I, section 1, observing this provision was passed by voters to guard against the "accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society." (*White v. Davis* (1975) 13 Cal.3d 757, 774.) Plaintiffs maintain a more rigorous standard applies where privacy rights are implicated, which *Buza* did not address because the defendant in that case advanced only a claim under section 13.

Plaintiffs are correct that in *Buza* the defendant challenged the DNA Act on federal and state search and seizure grounds. (*Buza, supra,* 4 Cal.5th at pp. 679, 684.) But in considering the defendant's state constitutional challenge, the court acknowledged "the heightened privacy interests in the sensitive information that can be extracted from a person's DNA" and that "[t]hese interests implicate not only California Constitution, article I, section 13, but the privacy rights enjoyed by all Californians under the explicit protection of article I, section 1 of the California Constitution." (*Buza,* at pp. 689-690.) The court went on to state "safeguards against the wrongful use or disclosure of sensitive information may minimize the privacy intrusion," and pointed out the DNA Law "makes misuse of a DNA sample a felony, punishable by years of imprisonment and criminal fines." (*Id.* at p. 690.) "These strong

15

sanctions," said the court, "substantially reduce the likelihood of an unjustified intrusion on the suspect's privacy." (*Ibid.*)

It is true the high court acknowledged "the possibility that technological change might alter the privacy interests at stake, requiring a new constitutional analysis." (*Buza, supra,* 4 Cal.5th at p. 690.) But this was in the context of having stated, as did *King,* "that CODIS testing is designed to reveal nothing more about the arrestee than his or her identity." (*Id.* at p. 689; see *id.* at p. 666 ["The laboratory uses the samples to create a unique DNA identification profile, using genetic loci that are known as 'junk' or 'noncoding' DNA, because the loci have no known association with any genetic trait, disease, or predisposition."].) If, due to technological advancements, testing would to "lead to discovery of personal medical information," this might, said the court, "alter the privacy interests at stake, requiring a new constitutional analysis." (*Id.* at pp. 689-690.) However, such circumstances were not before the court in *Buza.* Nor are they before us here.

Finally, the court rejected the defendant's reliance on our state constitutional right of privacy as affording "arrested suspects greater privacy rights than they possess under the Fourth Amendment." (*Buza, supra,* 4 Cal.5th at p. 690.) And in doing so, the court observed that "California law and federal law alike recognize that an arrestee has reduced privacy interests upon being taken into police custody." (*Ibid.*; see *Loder v. Municipal Court* (1976) 17 Cal.3d 859, 864 (*Loder*) ["at the time of arrest the suspect's right of privacy is obviously outweighed by the necessity of identifying him correctly"].)

In sum, we conclude *Buza* is controlling as to plaintiffs' claim that the state's DNA Law is unconstitutional because the analysis of DNA samples and posting of profiles is not deferred until after criminal charges are filed, a probable cause determination is made, and the state prosecutes the case.

### *"Automatic" Expungement*

Plaintiffs' second challenge to the DNA Law focuses on the statute's expungement provisions, which they claim are constitutionally inadequate with respect to arrestees "who are never convicted and have no prior qualifying convictions." They point out, as did the defendant in *Buza,* that, in contrast to our statute, the Maryland statute upheld in *King* provided for "automatic destruction" of DNA samples of arrestees "cleared of felony charges."[5] (*Buza, supra,* 4 Cal.5th at p. 674.)

In *In re C.B.,* our high court summarized the history of the statutory expungement procedures, explaining that "[s]ince the databank's inception, submission and removal of samples have been governed by different standards. In 1983, the state began collecting blood and saliva samples from mentally disordered sex offenders but provided no mechanism for removal or expungement. (Former § 290.2, enacted by Stats. 1983, ch. 700, § 1, pp. 2680-2681.) By 1996, the categories of offenders required to submit samples had expanded to include those convicted of certain violent felonies. (Former § 290.2, subd. (a), as amended by Stats. 1996, ch. 917, § 2, p. 5217.) Biological evidence from known or unknown suspects could also be included in the databank, but had to be stricken if an individual was later excluded as a suspect. (Former § 290.2, subd. (f)(3).) The law still contained no provision for removing samples submitted by those convicted of crimes." (*In re C.B., supra*, 6 Cal. 5th at pp. 126-127.)

---

[5] We note that as of 2018, of the 31 states (plus the federal government) that require DNA samples from arrestees or those charged with a crime, more than half do not provide for automatic expungement. (National Conference of State Legislatures, DNA Arrestee Laws <https://www.ncsl.org/Documents/cj/Arrestee_DNA_Laws.pdf> [as of June 10, 2021].)

"In 1998, the DNA Act comprehensively revised the statutory scheme for both collection and retention of samples, repealing former section 290.2 and adding a new chapter to the Penal Code.  (Stats. 1998, ch. 696, pp. 4571-4587. . . .)  The universe of those required to submit samples again expanded.  (Former § 296, enacted by Stats. 1998, ch. 696, § 2, pp. 4574-4575.)  For the first time, the revised statutory scheme provided standards for removal of samples taken from those who had previously been charged with or convicted of a crime.  (Former § 299, enacted by Stats. 1998, ch. 696, § 2, pp. 4582-4583).  In cases of reversal, acquittal, or a finding of factual innocence, the court entering the judgment was directed to order expungement.  (Former § 299 subd. (a).)  In the alternative, an affected individual could request expungement.  (*Id*., subd. (b)(1).)"  (*In re C.B., supra,* 6 Cal. 5th at p. 127.)

"In 2004, Proposition 69 reorganized the expungement provisions and amended the procedures for obtaining removal, which was still available only in limited circumstances.  ([Voter Information Guide, Gen. Elec. (Nov. 2, 2004) text of Prop. 69,] § III.9, pp. 141-142.)  The court's independent duty to order expungement was eliminated.  (*Ibid*.; see former § 299, subd. (a), as enacted by Stats. 1998, ch. 696, § 2, pp. 4571, 4582.)  The Department of Justice was no longer required to periodically review and purge samples from former suspects.  (Prop. 69 Voter Guide, *supra*, text of Prop. 69, § III.9, pp. 141-142; see former § 299, subd. (d), as enacted by Stats. 2000, ch. 823, § 5, pp. 5680-5681.)  An additional basis for expungement was added, however.  Because Proposition 69 for the first time extended the duty to submit samples to specified *arrestees*, it also allowed individuals to seek expungement if charges were not filed or were subsequently dismissed.  (§ 299, subd. (b)(1).)"  (*In re C.B., supra,* 6 Cal. 5th at p. 127.)

As plaintiffs do here, the defendant in *Buza* argued the statutory expungement provisions "mean that a DNA profile can be generated and maintained in the state database even after a suspect's arrest has been found to be mistaken or unlawful," and, in fact, "make it possible for the state to retain the DNA sample and associated records for an extended period of time—perhaps even indefinitely—after the prosecutor has declined to file or has dismissed charges, or after those charges have failed to yield a conviction." (*Buza, supra,* 4 Cal.5th at p. 680.)  In short, the defendant argued, as do plaintiffs, that "the DNA Act's expungement provisions are insufficient to protect the privacy rights of felony arrestees who are later found to have been wrongly arrested or who are cleared of wrongdoing." (*Ibid.*)

After pointing out that "retention of an arrestee's fingerprints, photographs, and other identifying information in law enforcement files generally has not been thought to raise constitutional concerns, even though the arrestee may later be exonerated," the high court identified the specific question before it as "whether, given the uniquely sensitive nature of DNA information, a different rule should apply here: one that calls not only for expungement, but for automatic expungement of an arrestee's DNA sample, DNA identification profile, or both after an arrest has been shown to be invalid or after an arrestee is cleared of charges, or both." (*Buza, supra*, 4 Cal.5th at pp. 680-681.)  The court declined to answer the question because the defendant had not been wrongfully arrested or cleared of charges.  Nor had he, of course, sought expungement.  (*Id.* at p. 681.)

The court went on to explain that "[r]estraint" was "particularly warranted" because much of the defendant's argument "depend[ed] on assertions about the workings of the expungement procedures that are as yet untested and unproved." (*Buza, supra*, 4 Cal.5th at p. 681.)  For example, the record

19

revealed nothing "about how the expungement provisions operate in a case in which a judge finds no probable cause to support the arrest." (*Ibid.*) While the statute makes "clear that a person who is found to have been wrongly arrested is entitled to expungement: it says that 'a person who has no past or present qualifying offense' may make a request for expungement if, among other things, no qualifying charges have been filed 'within the applicable period allowed by law' or if qualifying charges 'have been dismissed prior to adjudication by a trier of fact.' (Pen. Code, § 299, subd. (b)(1).) But the requirement that the arrestee make a written request with supporting documentation from the court or the district attorney, for example, appears to be aimed at dispelling any doubt as to whether qualifying charges may still be filed against the arrestee. (*Id.*, § 299, subd. (c)(2)(B).) It is unclear whether or how this requirement would apply in a case in which a judge has ruled from the outset that the defendant's felony arrest was unsupported by probable cause." (*Buza,* at pp. 681-682.)

"Much the same," said the court, was "true about [the] defendant's concern that the state may indefinitely retain DNA information of a person who, though arrested, has been found innocent of any crime." (*Buza, supra,* 4 Cal.5th at p. 682.) While the defendant asserted "a prosecutor may unilaterally block expungement by objecting for any reason, and a trial court likewise may deny expungement in its unconstrained discretion. It is not clear that he is correct on either score. It is true that the DNA Act describes a process that permits prosecutors to file objections to expungement (Pen. Code, § 299, subd. (c)(2)(D)), and speaks of trial court 'discretion' to grant or deny an expungement request (*id.*, § 299, subd. (c)(1)). But the DNA Act also provides that if there is no other legal basis for retaining the information, an exonerated arrestee '*shall* have his or her DNA specimen and sample destroyed

20

and searchable database profile expunged from the databank program.' (Pen. Code, § 299, subd. (a), italics added.) Federal law likewise provides that a state participating in CODIS 'shall promptly expunge' from that database the DNA profile of any person who is later cleared of qualifying charges. (34 U.S.C. § 12592(d)(2)(A).)" (*Buza,* at p. 682.)

In addition, said the court, it did not appear that "a trial court order" is "a necessary prerequisite to expungement." (*Buza, supra,* 4 Cal.5th at p. 682.) "[T]he DOJ has created a 'streamlined' process whereby eligible individuals may seek expungement directly from the department, using a publicly available two-page form.[6]" (*Ibid.*) Moreover, if an expedited request is denied, an individual may still initiate a court proceeding, using the judicial council form. (*Haskell, supra,* 317 F.Supp.3d at pp. 1110-1111.) The defendant in *Buza* did "not question the department's authority to create this alternative, 'streamlined' expungement process. (See Pen. Code, § 295, subd. (h)(1) [authorizing the department to adopt policies and enact regulations for the implementation of the DNA Act].) And although he note[d] that a trial court might have to get involved if the department denies a valid expungement request, he point[ed] to no case in which such a thing has occurred." (*Buza,* at pp. 682-683.)

Thus, not only had the defendant in *Buza* not sought expungement, but because of that, the high court had no record basis to "resolve any questions that might arise about the implementation of the expungement provisions in other cases." (*Buza, supra,* 4 Cal.5th at p. 683.) "It suffices to note," said the

---

6 "As the Attorney General notes, the frequently asked questions page on the DOJ website indicates that the expedited expungement process is generally completed within two to four weeks. (See <https://oag.ca.gov/bfs/prop69/faqs#retention> [as of Apr. 2, 2018].)"

court, "that many of defendant's assertions about the operation of the expungement process are, at this point, necessarily speculative," and the "court ordinarily does not issue constitutional rulings based on speculation, and we will not do so here." (*Ibid.*)

Similar observations can be made as to plaintiffs here, as they forthrightly concede that "none of them has been personally affected by" the DNA statute. And, in part, for this reason, the trial court concluded *Buza* foreclosed plaintiffs' challenge to the expungement provisions.

However, unlike the individual defendant in *Buza*, who challenged only his personal conviction for failure to comply with that law, plaintiffs invoke public-interest mandamus and taxpayer standing and challenge the overall implementation and operation of the statutory expungement process as constitutionally infirm. Thus, while we would agree that an individual who was wrongfully arrested and who advanced only a personal challenge to the expungement provisions would face the same standing hurdles discussed in *Buza,* that is not the case with respect to plaintiffs under recognized exceptions to otherwise generally applicable standing principles.

Specifically, we conclude plaintiffs have sufficiently alleged public-interest mandamus standing. *Weiss v. City of Los Angeles* (2016) 2 Cal.App.5th 194, succinctly summarizes this doctrine: " 'The exercise of jurisdiction in mandamus rests to a considerable extent in the wise discretion of the court.' (*McDonald v. Stockton Met. Transit Dist.* (1973) 36 Cal.App.3d 436, 440. . . .) Under the doctrine of public interest standing, ' " 'where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the [petitioner] need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced.' " [Citation.]'

22

(*Save the Plastic Bag,* [*Coalition v. City of Manhattan Beach* (2011)] 52 Cal.4th [155,] 166.) Indeed, California 'courts have repeatedly applied the "public right/public duty" exception to the general rule that ordinarily a writ of mandate will issue only to persons who are "beneficially interested." [Citation.]' (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1116–1117. . . .) In determining whether a petitioner has public interest standing, the court also considers the burden on those who have a beneficial interest, and would have general standing, but who may be disinclined or ill-equipped to seek review. (See *Driving Sch. Assn. of Cal. v. San Mateo Union High Sch. Dist.* (1992) 11 Cal.App.4th 1513, 1518–1519 . . . .)" (*Weiss,* at p. 205.)

The last point tips the balance in favor of public interest here. An individual who has been wrongfully arrested or as to whom criminal charges have been dismissed may well not have the resources to advance the institutional challenge to the expungement provisions plaintiffs seek to pursue here. In short, unless public interest standing is available, the "important public interest raised by [the] petition [is] effectively insulated from judicial review." (*Weiss, supra,* 2 Cal.App.5th at p. 206; see *ibid.* [challenge to method by which city conducted first level review of parking citations]; see *Citizens for Amending Proposition L v. City of Pomona* (2018) 28 Cal.App.5th 1159, 1165, 1173-1177 [challenge to action by city allegedly violating anti-billboard provision of municipal code that had been adopted through initiative measure]; *California DUI Lawyers Assn. v. Department of Motor Vehicles* (2018) 20 Cal.App.5th 1247, 1251 [challenge to procedure by which the Department of Motor Vehicles conducted administrative suspension hearings claiming,

specifically, that hearing officers simultaneously acting as advocates for the Department and as triers of fact, violated drivers' due process rights].)[7]

We further conclude, given the generous standard of review applicable to dismissals following the sustaining of a demurrer, that plaintiffs have cleared the minimal hurdle of alleging a claim that the statutory expungement provisions do not comport with our state constitutional right of privacy.

At oral argument, plaintiffs conceded they are not, in this regard, advancing a "facial" challenge to the statute, but are endeavoring to make an "as applied" challenge—that is, a challenge to the statute as it applies to arrestees "who are never convicted and have no prior qualifying convictions."[8]

---

[7] Given our conclusion that plaintiffs have adequately alleged public interest mandamus standing, we need not consider whether Shanks can claim taxpayer standing.

[8] Plaintiffs concession is understandable. " 'A facial challenge is " 'the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [law] would be valid." ' " (*American Civil Rights Foundation v. Berkeley Unified School Dist.* (2009) 172 Cal.App.4th 207, 217; *Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660, 678.) " 'A claimant who advances a facial challenge faces an "uphill battle . . ." [citation]' (*Home Builders Assn. v. City of Napa* (2001) 90 Cal.App.4th 188, 194 . . .), and . . . ' " " 'cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute. . . . Rather, [such claimant] must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.' " ' (*Tobe v. City of Santa Ana, supra,* 9 Cal.4th at p. 1084. . . .)" (*Rental Housing Owners Assn. of Southern Alameda County, Inc. v. City of Hayward* (2011) 200 Cal.App.4th 81, 90.) Plaintiffs' challenge does not, and cannot, meet this standard. While they have alleged that the DNA information of a very significant number of arrestees who were never charged, or as to whom charges were dropped, or who successfully defended against the charges against them, remains in the state's data base, they do not allege, and have not maintained they can allege, that under "no set of circumstances" does the law fail to violate such an arrestee's constitutional rights.

The trial court concluded that, under *Buza,* plaintiffs were effectively making a facial challenge, on which they admittedly could not succeed, regardless of their assertion to the contrary. However, we do not read *Buza* as conclusively foreclosing an "as applied" challenge of the sort plaintiffs advance here. (See *Buza, supra*, 4 Cal.5th at pp. 692-694 [although court exercises " 'judicial restraint' " to consider circumstances beyond those of the individual defendant before the court, court does not categorically foreclose broader challenge].)

We also conclude plaintiffs have made the minimally required allegations that the expungement provisions implicate the right of privacy secured by our state constitution. As plaintiffs point out, a rigorous balancing standard applies when the right of privacy is implicated. (See *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35-40; e.g., *People v. Laird* (2018) 27 Cal.App.5th 458, 471-472 (*Laird*).) And in contrast to an arrestee in police custody who has a reduced expectation of privacy, we are not persuaded that an individual who is *no longer* an arrestee or a defendant, and who meets all the legal requirements to have his or her DNA information expunged, does not have a measurably greater privacy interest than does an arrestee in custody in his or her genetic information. (See *Buza, supra,* 4 Cal.5th at pp. 680-681 [while "the retention of an arrestee's fingerprints, photographs, and other identifying information in law enforcement files generally has not been thought to raise constitutional concerns, even though the arrestee may later be exonerated," court expressly does not address extent to which this rule applies to DNA information obtained from arrestee whose arrest is shown to be invalid or is cleared of charges].) Plaintiffs further allege that the current expungement provisions result in significant racial disparities in the state's DNA database and as to those individuals whose privacy is allegedly impli-

25

cated. Such allegations have never been considered by any court, and we conclude plaintiffs have sufficiently alleged a claim warranting further development.

On the other hand, the court emphasized in *Buza* that the fact only " 'junk' " or " 'noncoding' " DNA is analyzed, that there are strict limits on the use and disclosure of DNA information, that there are significant criminal punishments and civil liabilities for the violation of these limitations, and that the availability of an expungement procedure, all weigh against any determination that the retention of DNA samples and profiles amounts to an undue intrusion into privacy interests. (*Buza, supra*, 4 Cal.5th at pp. 666-667, 689-690, 692; see *Laird, supra,* 27 Cal.App.5th at pp. 471-473 [state constitutional right of privacy did not require expungement of DNA records following reduction of defendant's felony conviction to an infraction; state's "legitimate interests" in the collection and retention of the defendant's DNA, especially in light of " 'the limited scope of the DNA information collected, the strict limits on the state's use of the DNA, and the criminal punishment imposed on persons who violate those limitations,' " outweighed "any privacy interest" he had in expungement]; *Haskell v. Harris* (9th Cir. 2014) 745 F.3d 1269, 1274 (conc. opn. of Smith, J.) [rejecting federal constitutional claims on behalf of arrestees never convicted of the crimes for which they were arrested; although "expungement of DNA samples is not automatic under California law, this distinction [from the Maryland law upheld in *King*] is not constitutionally relevant"]; *Haskell, supra,* 317 F.Supp.3d at pp. 1110-1111 [rejecting federal constitutional claims by arrestees who were never charged; "no authority" supported plaintiffs' claim that, unlike Maryland's "automatic" expungement provision, California's expungement process was "altogether

26

'inadequate' "; "California's expungement process is an inconsequential example of how state's laws 'vary in their particulars' from the Maryland law"].) We also are unaware of *any* authority suggesting it is an abridgement of *constitutional* rights to require an individual entitled to relief of any sort to initiate a statutorily provided procedure for such relief.[9]

In sum, at this early juncture, we conclude only that plaintiffs have met the minimal pleading burden required to survive a demurrer as to their challenge to the DNA statute's expungement provisions, and we express no view as to whether they can succeed on the merits of their claim.

## DISPOSITION

The judgment of dismissal is reversed as to plaintiffs' challenge to the DNA Law's expungement provisions and is affirmed in all other respects. Parties to bear their own costs on appeal.

---

[9] As the Attorney General observes, the DNA Law expungement provisions are similar to the statutory provisions allowing an arrestee who is not charged to file a petition, after the limitations period to file charges has passed, for destruction of the arrest records. (Pen. Code, § 851.8; see *People v. Bedrossian* (2018) 20 Cal.App.5th 1070, 1073, 1076 [rejecting due process and equal protection claims by arrestee who was never charged and petitioned for destruction of arrest records before limitation period lapsed; statute "strikes a reasonable balance" between interests of the individual "and the government's competing interests"].)

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Sanchez, J.